IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| EDWIN YOUNG, | ) | |
| --- | --- | --- |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Civil Action No. 7-626 |
| AMERICAN INTERNATIONAL | ) ) | |
| LIFE ASSURANCE COMPANY | ) | |
| OF NEW YORK, | ) | |
| Defendant. | ) | |

AMBROSE, Chief District Judge

## OPINION
### and
## ORDER OF COURT

Plaintiff, who received twenty-four months of long-term disability benefits based upon a

"mental disability," sought an extension of benefits under the theory that he was also physically

disabled from performing his job. His claim was denied. After several unsuccessful administrative

appeals, he filed suit under § 502(a) of the Employee Retirement Income Security Act of 1974, as

amended, 29 U.S.C. § 1132(a)(1)(B) ("ERISA"). The parties have filed cross motions for summary

judgment. See Docket Nos. [31] and [35]. For the reasons set forth below, the Plaintiff's Motion

is denied and the Defendant's Motion is granted.[1]

### Factual Background

Plaintiff Edwin Young ("Young") worked for nearly a decade as a managing attorney with

---

[1] In conjunction with its Brief in Opposition to Plaintiff's Cross-Motion for Summary
Judgment, Defendant lodged an Objection to Plaintiff's failure to comply with LR 56.1(B), which
requires that each motion for summary judgment be accompanied by a Concise Statement of
Material Fact. I agree that Plaintiff failed to comply with LR 56.1(B) in this regard. Given,
however, that the parties were cross filing motions and replies, and that Plaintiff had filed
Responses to Defendant's Statement of Material Facts (Docket No. [45]) I will overlook
Plaintiff's noncompliance in this instance.

American International Group, Inc. ("AIG").[2] As an AIG employee, Young was an eligible participant under Group Insurance Policy GLT-10761 issued by Defendant American International Life Assurance Company ("Am Life") to AIG. The Policy is an employee sponsored benefit program subject to the terms and conditions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq.

The Policy provided for the payment of Long Term Disability ("LTD") benefits, in Young's instance, once a 180 day elimination period transpired. See AMER004. Young sought LTD benefits following a cessation of work on November 27, 2001. In his LTD Benefits Claim Form, Young stated that he became unable to work at his position as a managing attorney in November of 2001 because of "major depression / panic disorder caused by stressful work environment / workload." See AMER0794. He explained that his first symptoms of this disability were "severe chest pains, pains shooting up neck. Id.

On June 27, 2002, Young learned that his claim for LTD benefits was approved under the Mental Illness and Substance Abuse provision of the Policy and that benefits would be payable for a 24 month period. See AMER717-719. Because the first payment was made for May of 2002, no payments would be made beyond May 27, 2004. Id.

As a condition of receipt of LTD benefits, Young applied for Social Security Disability Benefits ("SSD"). The Social Security Administration ("SSA") eventually awarded Young such benefits. See AMER0639-0642. The SSA determined, without examining Young, that he became disabled on November 26, 2001. See AMER0641.

Prior to the cessation of his LTD benefits, Young notified AIG that his disability was ongoing and that he wished to "appeal" the impending termination of his benefits. See AMER0625. A few months later, on August 4, 2004, Young explained that his disability was "physical" in nature. See

---

[2] AIG was initially named as a Defendant in this litigation but was dismissed by this Court on September 17, 2007. See Docket No. [14].

AMER 0618. In doing so, he referenced an enclosed letter from his cardiologist, Dr. Dennis Eberz.

In his July 1, 2004 letter, Dr. Eberz first took issue with the distinction in the Policy between physical and mental disabilities. See AMER0619. He then suggested that Young's disability was not based purely on mental reasons. Specifically, he referenced Young's history of chest pain and gastroesophageal reflux, both of which he associated with Young's long hours and stress at work. Id. His office notes from that day, which were incorporated by reference into his letter, also mentioned carpal tunnel and rotator cuff syndrome. See AMER 0621. Dr. Eberz opined that "this patient is not capable of returning to work for both physical and mental reasons." See AMER0619.

Young then completed a new Medical History Form; the claim administrator requested records to evaluate Young's disability from a physical standpoint; and the information was sent out for an independent medical review. See AMER0538. Dr. Rose Ho, who is board certified in physical medicine and rehabilitation, performed the independent medical review. See AMER0504-0507. She spoke with Dr. Eberz and ultimately concluded that Young's condition did not rise to a level of physical impairment. See AMER0507.

On March 14, 2005, the claim administrator ("CA") provided Young an analysis of his appeal of termination of the LTD benefits. See AMER0497-0500. The CA explained that the medical information did not support a claim of a physical disability. Instead, the CA affirmed that Young's disability "was a result of a mental illness." See AMER0497.

Young then appealed that decision through counsel. See AMER0494-0495. In connection with that appeal, Young submitted a September 20, 2005 letter from Dr. Eberz. In that letter, Dr. Eberz stated that Young "definitely suffers a risk of disability were he to go back to work and that disability could occur either in the cardiac area, gastrointestinal area and from the respiratory standpoint as well." See AMER0471. Dr. Eberz continued on to state that he believed that "there is a medically unacceptable risk for Mr. Young to go back to work from the standpoint of perhaps even a myocardial infarction or other such calamity in the other areas outlined above." Id. Dr.

3

Eberz urged that Young could not "tolerate full time work or even part time work with the firm that he was formally employed." Id. Young himself also submitted a sworn affidavit in which he stated that he was physically disabled because of a rotator cuff tear, carpal tunnel syndrome, asthmatic bronchitis and cardiac problems. See AMER0463.

On January 11, 2006, the CA informed Young by way of letter that the previous decision would be upheld. In so doing, the CA specifically acknowledged receiving and reviewing Dr. Eberz's September 20, 2005 letter and Young's November 2, 2005 affidavit. See AMER0440. Young thereafter appealed this decision. See AMER0436.[3] The CA made several attempts to ascertain the basis of the appeal and requested updated medical records. See AMER0396. Young responded that the basis of the appeal was that he remained "disabled under this policy for medical reasons outside the scope of the two-year limitation." See AMER0390. The records ultimately were forwarded to Dr. Robert L. Marks for an independent physician review.

Dr. Marks reviewed the records and spoke both with Dr. Eberz, Dr. Henderson and Bill Hall, P.A. of Dr. Mutschler's office. See AMER0177-0193. Dr. Marks concluded that from November 27, 2001, Young should have been able to perform physically the duties of his work, but with "some limitations." See AMER0186. Dr. Marks noted that the limitations stemmed from the shoulder tendon problems and thumb discomfort and relate to postural limitations, lifting restrictions and the wearing of fitted wrist splints. See AMER0186. Dr. Marks added that "[m]ost of the limitations are actually recommendations for asymptomatic individuals in an otherwise 'normal' work situation." See AMER0187.

Upon receipt of Dr. Marks' report, the CA sought the assistance of a Rehabilitation Case Manager to determine whether Young could physically perform his own occupation with the restrictions and limitations noted by Dr. Marks. See AMER34-35. The RCM concluded that Young

---

[3] There appears to be some dispute over whether the appeal was timely, but the CA ultimately agreed to review the appeal so that issue is not before me.

4

was capable of performing sedentary to light work. Id.

Following a review of all the information relating to Young's contention that he was physically disabled and entitled to LTD benefits, the CA issued a decision upholding the earlier denial of an extension of benefits. Young thereafter filed suit in this Court. The parties have filed cross motions for summary judgment. Am Life urges that the claim administrator's decision was not arbitrary, capricious or otherwise improper. Young counters that a heightened arbitrary and capricious standard of review is required here,[4] and that the administrator's decision is not defensible in light of that standard.

## Summary Judgment Standard

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material when it might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Rule 56 mandates the entry of judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, the Court must examine the facts in the light

---

[4] Young advances an alternative argument that I should adopt a *de novo* standard of review because of Am Life's conduct during the discovery phase of this case. See Docket No. [36], p. 5-6. I decline to do so. First, Young has not supplied any citation to authority indicating that a *de novo* standard is appropriate in such an instance. Second, I have no evidence indicating that Am Life acted inappropriately during discovery. Certainly I did grant Young's Motion to Compel. See Docket No. [25]. Yet if Young was dissatisfied with Am Life's actions in response thereto, he should have taken the matter up with the Court in a more direct and immediate fashion rather than waiting several months and addressing the issue in a brief in support of summary judgment.

5

most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. Anderson, 477 U.S. at 248. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

## ERISA Standard of Review

The standard of review in any ERISA case depends in part upon the level of discretion given to the claims administrator. See Addis v. The Limited Long-Term Disability Program, 268 Fed. Appx. 157, 160 (3d Cir. 2008). Here, the Policy gives Am Life the full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy. See AMER022. Under normal circumstances then, a court would apply an "arbitrary and capricious" standard of review. Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 384 (3d Cir. 2003). "Under the arbitrary and capricious standard, an administrator's decision will only be overturned if it is without reason, unsupported by substantial evidence or erroneous as a matter of law [and] the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Lasser, 344 F.3d at 384, quoting, Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000).

Young contends that a modified arbitrary and capricious standard of review is required because of an existing conflict of interest and procedural irregularities which occurred during the administrative review process. Young has the burden of demonstrating that his case calls for a

6

heightened standard of review. See Kostrosits v. GA TX Corp. Non-Contributory Pension Plan for Salaried Employees, 970 F.2d 1165, 1174 (3d Cir. 2003). Where such conflicts and irregularities do exist, a court must employ a sliding scale standard of review, "'grant[ing] the administrator deference in accordance with the level of conflict.'" Addis, 268 Fed. Appx. at 160, quoting, Post v. Hartford Ins. Co., 501 F.3d 154, 161 (3d Cir. 2007). "The premise of the sliding scale approach is that courts should examine benefit denials on their facts to determine whether the administrator abused its discretion." Post, 501 F.3d at 161 (citation omitted). "To apply the approach, courts first consider the evidence that the administrator acted from an improper motive and heighten their level of scrutiny appropriately." Addis, 268 Fed. Appx. at 160. "Second, they review the merits of the decision and the evidence of impropriety together to determine whether the administrator properly exercised the discretion accorded it. If so, the decision stands; if not, the court steps into the shoes of the administrator and rules on the merits itself." Id.

"Determining how to apply heightened arbitrary and capricious review requires considering both structural and procedural factors." Post, 501 F.3d at 162 (citations omitted). "The structural inquiry focuses on the financial incentives created by the way the plan is organized, whereas the procedural inquiry focuses on how the administrator treated the particular claimant." Id. Young alleges both structural and procedural problems.

The structural inquiry "evaluates whether 'the plan is set up so that the administrator has strong financial incentives to routinely deny claims in close cases.'" Fultz v. Liberty Life Assurance Company of Boston, Civ. No. 5-1542, 2008 WL 1773941 at * 10 (W.D. Pa. April 16, 2008) (quotation omitted).The Third Circuit court has identified four non-exclusive structural factors for district courts to consider in this respect: (1) the sophistication of the parties; (2) the information accessible to the beneficiary; (3) the financial arrangement between the employer and the administrator; and (4) the financial status of the administrator. Id., p. 163. Young offers no argument as to the sophistication of the parties, the available information or the financial status of

7

the administrator. Indeed, the record indicates that Young is an extremely sophisticated party - an attorney with years of experience in the insurance industry. Further, the administrative record before me is replete with requests from Young for information, all of which he apparently received.[5] Nor is there any indication that the administrator - Hartford Life Insurance Company - was in any financial duress. These factors would counsel against a heightened arbitrary and capricious standard of review.

Nevertheless, Young contends that a heightened form of review is required because a provision in the Administrative Services Agreement ("ASA") operated so as to strip Hartford of its administrative duties in this instance. According to Young, Am Life acted both as insurer and final decision maker.[6] I question whether Young's reading of the ASA is accurate in this respect[7] but Am Life offers no response. If Young's reading of the ASA is correct, then a conflict of interest exists because Am Life acted as the insurer and the final decision maker.

In any event, Am Life itself recognizes that a conflict of interest existed - though for a different reason. According to Am Life, the benefits paid under the Policy were subject to a

---

[5] Again, I note as above that Young contends Am Life failed to tender materials in compliance with an Order issued in conjunction with a Motion to Compel, but that issue is not before me at this juncture.

[6] Section 5(e) of the ASA provides:
Administrator will refer, in writing, all Disputed Claims to Insurer for determination. Insurer will notify Administrator in writing of its determination with respect to the Disputed Claim within 3 business days of receipt of the documentation as to the Disputed Claim. If Insurer disagrees with Administrator's decision as to the Disputed Claim, Insurer has the sole right to determine how the Disputed Claim will be handled.

[7] The ASA defines the term "disputed claim" as "a claim (a) that the Administrator has denied in whole or in part, and (b) for which Administrator's determination has been disputed or appealed in writing, including but not limited to in the forms of insurance department complaints, threats of litigation, and actual litigation. A claim regarding which the Administrator is waiting for further information is not a Disputed Claim. " See Section 1.6 of ASA. At the time the decisions were being made, Young had not threatened litigation, engaged in litigation, filed a complaint with an insurance department or engaged in other substantially similar behavior. Rather, Young's appeal process appeared to progress in a normal trajectory.

8

reinsurance treaty wherein a Hartford Insurance Company entity reinsured the Policy issued by Am Life to Young's employer AIG. See Docket No. [33], p. 10-11. As such, Am Life reasons, Hartford acted as administrator and a reinsurer and may have had a financial incentive to deny close claims. Id.

Regardless of whether Young's reading of the Policy and ASA is correct or whether Am Life's is correct, there is consensus as to the existence of a financial conflict of interest. Consequently, I agree that this requires a heightening of the arbitrary and capricious standard of review. Yet as the Third Circuit court noted less than a year ago, it has:

> not reported a case in which structural factors alone warranted anything more than moderately heightening [its] review. This is not fortuitous. Structural conflicts of interest warrant more searching review, but in the absence of evidence that bias infected the particular decision at issue, [the court] defer[s] to an administrator's reasonable and carefully considered conclusions.

Post, 501 F.3d at 164, citing, Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000).

A review of the procedural factors convinces me that nothing more than a moderately heightened arbitrary and capricious standard of review is appropriate here. There simply is no evidence that the administrator acted with any bias. For instance, the Third Circuit court has identified the following as an illustrative, not exhaustive, list of procedural factors to consider when evaluating whether an administrator has given the court reason to doubt its fiduciary neutrality: (1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; (4) and requesting a medical examination when all of the evidence indicates disability. See Post, 501 F.3d at 164-65 (citations omitted).

Here Young, who bears the burden of establishing that a heightened review is required, has done nothing to demonstrate how the administrative record reflects the type of bias noted above.

9

Young simply recites the procedural factors and, without any citation to the record, concludes that such bias must exist. See Docket No. [36], p. 4-5. Further, my review of the record confirms that there were no procedural irregularities here. There was never a reversal of a position; there was no disregarding of staff recommendation that benefits be awarded nor was there a request for a medical examination when all of the evidence indicated disability. Further, while Dr. Eberz did opine that Young suffered from a medically unacceptable risk of disability were he to return to work, his contention in this regard was not supported by any objective medical data. Indeed, his conclusion was contradicted by x-rays and stress tests which he himself administered. See AMER 0555, 0557-0558, 0563-0567, 0590-0591. Consequently, the rejection of Dr. Eberz's opinion in this regard did not amount to "self-serving selectivity."

After careful consideration, I find that a moderately heightened standard of review, at the lower end of the sliding scale, is required. Again, that standard of review is based solely upon the existence of one structural concern - the fact that the entity funding the plan (be that Hartford as the reinsurer or Am Life as the insurer) also made the final decision regarding eligibility. With this standard of review in mind, I turn to consider the merits of the decision to deny Young benefits.

## Analysis

Young contends that the CA erred in three instances, any of which mandate the reversal of the decision to deny the extension of benefits. First, Young contends that the CA and Dr. Marks failed to consider his treating physician's statements regarding the "medically unacceptable risks" should Young return to work. Second, Young finds fault with the CA's conclusion that his treating physician found that Young could return to his own occupation. Third and finally, Young urges that the Policy did not allow the CA to consider whether he could return to work with accommodations.

### A. "Medically Unacceptable Risks"

As set forth above, Dr. Eberz tendered a letter dated September 20, 2005 in which he

10

stated that Young "definitely suffers a risk of disability were he to go back to work and that disability could occur either in the cardiac area, gastrointestinal area and from the respiratory standpoint as well." See AMER0471. Dr. Eberz continued on to state that he believed that "there is a medically unacceptable risk for Mr. Young to go back to work from the standpoint of perhaps even a myocardial infarction or other such calamity in the other areas outlined above." Id. Dr. Eberz urged that Young could not "tolerate full time work or even part time work with the firm that he was formally employed." Id. Young insists that neither Dr. Marks, the non-examining medical consultant, nor the CA reviewed the letter and that this failure demands reversal of the decision to deny benefits.

I disagree. First, while the administrative record does not specifically indicate that Dr. Marks read the September 20, 2005 letter, it does demonstrate that Dr. Marks reviewed Young's medical records and spoke with Dr. Eberz. See AMER0177-0193. Dr. Eberz told Dr. Marks that he last saw Young on June 28, 2005 and that he did not find any "major cardiac abnormalities," and that Young's physical condition was not of a magnitude to preclude his return to work. See AMER0173-0174. Further, and more importantly, the administrative record contains undisputed evidence that the CA reviewed Dr. Eberz's letter prior to denying benefits.

In a letter dated January 11, 006, the CA wrote:

On September 20, 2005, Dennis Eberz stated that you had asthmatic bronchitis and that you suffer risk of disability if you returned to work in the cardiac area, gastrointestinal area and from the respiratory standpoint as well. However, Dr. Eberz did not provide objective findings to support your functional limitations.

See AMER0128. Young's contention that the CA failed to review Dr. Eberz's letter is thus unfounded.

Additionally, the CA's conclusion in this regard was not arbitrary and capricious, even under the moderately heightened standard of review identified above. In fact, it is consistent with the medical evidence of record. Other than Dr. Eberz's letter referenced above, no physician opined

11

that Young was physically disabled. Further, Dr. Eberz's letter did not point to any medical evidence supporting the conclusion of an increased risk of disability.[8] Rather, Dr. Eberz's attached notes reference "regular" cardiac rhythms, clear lungs, no symptoms of reflux, and normal blood pressure. See AMER 0470-0479. Young's previous stress tests had proven normal. See AMER0745. Nothing suggested that Young had coronary artery disease. See AMER 0452. Dr. Eberz had previously told Dr. Ho in January of 2005 that Young "was ruled out for any cardiac problems" and that he did not believe that Young's "physical condition rose to a level in which he would be physically impaired." See AMER0506. Young's pulmonologist, Dr. Laurie Kilkenny, never opined that Young was disabled either. See AMER0400-0414. Dr. Ajay Seth, another of Young's treating physicians, explained that he believed Young's carpal tunnel was actually improving. See AMER0365. In light of the overwhelming medical evidence to the contrary, the CA was not obliged to accept a treating physician's bald statement of an increased risk of disability. In this context, reversal is not required.

B. Young's Return To His Own Occupation

Young's next argument is a variation of his first. He contends that the CA erroneously concluded that he could return to his occupation. As stated above, Dr. Marks understood Young's treating cardiologist, Dr. Eberz, to be of the opinion that Young could return to his previous work. See AMER0173-0174. Young contends that Dr. Marks' conclusion in this regard and any reliance by the CA thereon was erroneous and mandates reversal because it is not indicated in Dr. Marks' report whether "this meant a return to work in general part-time unskilled work available, or a return to work to his occupation as a managing or insurance attorney, a highly skilled and stressful position." See Docket No. [36], p. 17-18. Young believes it to be unreasonable to conclude that Dr. Eberz would have found Young able to return to his own occupation in light of his statement

---

[8] Nor did Young himself provide any citations to medical record suggesting that he had cardiac, respiratory and / or gastrointestinal problems not stemming from his mental disability.

12

that Young would suffer an increased risk of disability if he were to return to work.

For the reasons set forth above, I find that the CA's rejection of Dr. Eberz's conclusion that a return to work presented Young with an increased risk of disability was not arbitrary and capricious under the moderately heightened standard of review. Further, there is no suggestion in the record that Dr. Marks failed to understand the nature of Young's position as an attorney. Dr. Marks expressly recognized that Young was a "counsel managing attorney." See AMER 0178. He also indicated in his report that he reviewed Young's own affidavit in which he detailed his job duties. See AMER0178-0179. Accordingly, I find that the CA's reliance upon Dr. Marks' conclusion that Young could return to his former occupation was not arbitrary and capricious under the moderately heightened standard of review.

C. Reasonable Limitations[9]

Finally, Young faults the CA for relying upon Dr. Marks' conclusion that he could return to his former position if he was provided with some limitations.[10] Young contends that the Policy does not provide for the consideration of a return to work with "limitations." While I agree that the Policy does not specifically use the word "limitations," it does speak of a claimant's ability to perform the "essential duties" of one's occupation.

The Policy defines an "essential duty" as one which "can not be reasonably omitted or changed." See AMER0006. Young has not explained how typing without wrist splints, or sitting or standing without occasional postural changes, or lifting more than twenty-five pounds on a more

---

[9] Young uses the word "accommodations" while Dr. Marks used the word "limitations." I shall use the word provided by the medical expert.

[10] The specific "limitations" which Dr. Marks referenced related to Young's should tendon problems and thumb discomfort and consisted of the following: avoid lifting more than twenty-five pounds on a more than occasional frequency; avoid sitting more than forty-five minutes without a brief break for change of posture / position; properly fitted wrist splints; and the use of various devices to permit the easy transfer of files. See AMER0186. Significantly, Dr. Marks stated that "[m]ost of the limitations are actually recommended for asymptomatic individuals in an otherwise 'normal' work situation." See AMER0187.

than occasional basis, or foregoing the use of various devices to permit the easy transfer of files are somehow "essential duties" of his former job. Indeed, it was not arbitrary or capricious under the moderately heightened standard of review for the CA to conclude that these tasks could be reasonably changed, particularly in light of Dr. Marks' observation that these "limitations" are actually recommended for asymptomatic individuals in otherwise normal working conditions.

## Conclusion

In summary, I have reviewed Am Life's denial of the extension of Young's benefits under a moderately heightened arbitrary and capricious standard of review. The evidence presented to me demonstrates no structural or procedural anomaly other than that noted above with respect to Hartford both administering the claim and reinsuring the policy (or Am Life insuring the policy and administering the claim because it was disputed). Young simply provided no evidence to support his cardiologist's conclusion that a return to work provided an increased risk of disability. Further, his cardiologist's conclusion in this regard was at odds with all of the previous medical conclusions. The decision to deny Young's claim, when reviewed under a moderately heightened standard, was neither arbitrary nor capricious.

14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EDWIN YOUNG, )
)
Plaintiff, )
)
vs. ) Civil Action No. 7-626
)
AMERICAN INTERNATIONAL )
LIFE ASSURANCE COMPANY )
OF NEW YORK, )
Defendant. )

AMBROSE, Chief District Judge

## ORDER OF COURT

AND NOW, this $9th$ day of September, 2008, after careful consideration, and for the

reasons set forth in the accompanying Opinion, the Defendant's Motion for Summary Judgment

(Docket No. [31]) is GRANTED and the Plaintiff's Motion for Summary Judgment (Docket No. [35])

is DENIED.

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose,
Chief U.S. District Judge